PEARL INVESTMENTS,
LLC, Plaintiff

v.

STANDARD I/O, INC. and Jesse
Chunn, Defendants

Jesse CHUNN, Third–Party Plaintiff

v.

Dennis Daudelin, Third–
Party Defendant

No. Civ. 02–50–P–H.

United States District Court,
D. Maine.

April 23, 2003.

Represented by John G. Osborn, Todd S. Holbrook, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, Lead Attorney, Attorney to be Noticed, for Pearl Investments LLC, Plaintiff.

Represented by Robert H. Stier, Pierce, Atwood, Portland, ME, Lead Attorney, Attorney to be Noticed, for Standard I/O Inc, Defendant.

Represented by Robert H. Stier, Lead Attorney, Attorney to be Noticed, for Jesse Chunn, Defendant.

Represented by Robert H. Stier, Lead Attorney, Attorney to be Noticed, for Jesse Chunn, ThirdParty Plaintiff.

Represented by John G. Osborn, Todd S. Holbrook, Lead Attorney, Attorney to be Noticed, for Dennis Daudelin, Third-Party Defendant.

Represented by Jeffrey Bennett, The Bennett Law Firm, P.A., Portland, ME,

Lead Attorney, Attorney to be Noticed, for AB Watley Inc, ThirdParty Defendant.

Represented by Robert H. Stier, Lead Attorney, Attorney to be Noticed, for Standard I/O Inc, Counter Claimant.

Represented by Robert H. Stier, Lead Attorney, Attorney to be Noticed, for Jesse Chunn, Counter Claimant.

Represented by John G. Osborn, Todd S. Holbrook, (See above for address), Lead Attorney, Attorney to be Noticed, for Pearl Investments LLC, Counter Defendant.

### ORDER AFFIRMING RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

HORNBY, District Judge.

The United States Magistrate Judge filed with the court on March 21, 2003, with copies to counsel, his Recommended Decision on Cross-Motions for Summary Judgment (Docket Item 59 (sealed version) and Docket Item 62 (expanded public version)). The plaintiff and third-party defendant filed an objection to the Recommended Decision on April 4, 2003. I have reviewed and considered the Recommended Decision (sealed version), together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in his Recommended Decision, and determine that no further proceeding is necessary.

It is therefore ORDERED that the Recommended Decision of the Magistrate Judge is hereby ADOPTED. The plaintiff's motion for summary judgment is GRANTED as to Counts I and IV of the Counterclaim and otherwise is DENIED. The defendants' motion for summary judgment is GRANTED with respect to (i) Standard I/O, Inc., as to

Counts I and III of the Complaint; (ii) Chunn, as to Count I of the Complaint to the extent the claimed violation of the UTSA is predicated on the existence of GUIDs of the Chunn HDD; (iii) both Standard and Chunn, as to Counts II, IV, VII and VIII of the Complaint and that portion of Count VI of the Complaint asserting violation of an implied warranty/services; and (iv) Count II of the Counterclaim; and otherwise DENIED.

Remaining for trial are the following: Count I of the Complaint (misappropriation of trade secrets) against Chunn only, with the caveat that Pearl is precluded from premising any such claim on contents found on the HDD; Count III of the Complaint (violation of the DMCA) against Chunn only; Count V of the Complaint (breach of contract) against both Standard and Chunn; Count VI of the Complaint (breach of warranty/services) against both Standard and Chunn, to the extent asserting breach of express warranty only; and Count II of the Counterclaim, with respect only to the amount of damages to be awarded Chunn.

So ORDERED.

COHEN, United States Magistrate Judge.

### RECOMMENDED DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Pearl Investments, LLC ("Pearl") and defendants Standard I/O, Inc. ("Standard") and Jesse Chunn (together, "Defendants") cross-move for summary judgment as to Counts I and V of Pearl's eight-count complaint, and the Defendants move for summary judgment as to the remaining counts, in this action arising from Standard's provision of custom computer programming to Pearl. Motion for Partial Summary Judgment of Li-

ability on Counts I and V of the Complaint and for Summary Judgment on Counterclaims ("Plaintiff's S/J Motion") (Docket No. 19) (sealed) at 1; Motion by Defendants/Counterclaimants for Summary Judgment, etc. ("Defendants' S/J Motion") (Docket No. 26) (sealed) at 1; Complaint, etc. ("Complaint") (Docket No. 1) at 1–2. In addition, Chunn, Pearl and third-party defendant Dennis Daudelin cross-move for summary judgment as to Count II of Chunn's four-count counterclaim/third-party complaint, and Pearl and Daudelin move for summary judgment as to the remaining two counts applicable to them (Counts I and IV). Plaintiff's S/J Motion at 1–2; Opposition by Defendants to Plaintiff's Motion for Partial Summary Judgment and Cross–Motion for Summary Judgment on Counterclaim Count II ("Defendants' S/J Opposition") (Docket No. 30) (sealed) at 1; Answer, Counterclaim and Third–Party Complaint, etc. ("Answer") (Docket No. 2) at 15–20 ("Counterclaim").[1] Chunn concedes Pearl's and Daudelin's entitlement to summary judgment as to Count IV of the Counterclaim. Defendants' S/J Opposition at 2. For the reasons that follow, I recommend that both motions be granted in part and denied in part.[2]

## I. Summary Judgment Standards

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93–94 (1st Cir.2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir.2000). Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure

---

1. Count III of the Counterclaim pertains only to original third-party defendant A.B. Watley, Inc., whose motion to dismiss all third-party claims against it was granted. *See* Counterclaim ¶¶ 31–33; Order Affirming Recommended Decision of the Magistrate Judge (Docket No. 14).

2. The Defendants request oral argument on their motion for summary judgment, suggesting that the court would be assisted by such a hearing in view of "the seriousness of this motion, its attempt to address numerous counts, and the underlying complexity of the subject matter[.]" *See* Docket No. 46. Pearl and Daudelin oppose the motion, stating that the matter is no more complex or serious than other civil disputes. *See* Docket No. 51. Inasmuch as the parties' papers provide a sufficient basis on which to decide the motion, the Defendants' request for oral argument is denied.

to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

■ To the extent that parties cross-move for summary judgment, the court must draw all reasonable inferences against granting summary judgment to determine whether there are genuine issues of material fact to be tried. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 (1st Cir. 1992). If there are any genuine issues of material fact, both motions must be denied as to the affected issue or issues of law; if not, one party is entitled to judgment as a matter of law. 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720, at 336–37 (1998).

## II. Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant to this recommended decision: [3]

Pearl is a Maine limited liability company with its principal place of business in Portland, Maine. Plaintiff's Statement of Undisputed Material Facts in Support of Their [sic] Motion for Partial Summary Judgment of Liability on Counts I and V of the Complaint ("Plaintiff's SMF") (Docket No. 20) (sealed) ¶ 1; Defendants' Opposing Statement of Material Facts in Opposition to Plaintiff's Motion for Summary Judgment and in Support of the Cross–Motion for Summary Judgment ("Defendants' Opposing SMF") (Docket No. 31) ¶ 1. Pearl develops and operates automated stock-trading computer systems (collectively and individually, "Pearl's ATS"). *Id.* ¶ 2. Standard is a Maine corporation with its principal place of business in Portland, Maine. *Id.* ¶ 3. Standard provides custom software programming for third parties. *Id.* ¶ 4. Chunn, a Maine resident, is the sole owner of Standard. *Id.* ¶¶ 5–6.

In April 2000, Pearl hired Standard to perform software-programming services in relation to Pearl's ATS. Plaintiff's SMF ¶ 7; Complaint ¶ 13; Answer ¶ 13. Chunn was initially offered an equity interest in Pearl to carry out the programming, but declined the offer. Statement of Material Facts Not in Dispute by Defendants/Counterclaimants in Support of Their Motion for Summary Judgment ("Defendants' SMF") (Docket No. 27) (sealed) ¶ 3; Plaintiff Pearl Investment's Opposing Statement of Material Fact Pursuant to Local Rule 56(c) ("Plaintiff's Opposing SMF") (Docket No. 35) (sealed) ¶ 3. Instead, he proposed that Standard would do the programming work at a reduced hourly rate on a time-and-materials basis. *Id.* Pearl agreed. *Id.*

Standard provided software-development services from April 2000 through June 2001, with some miscellaneous transition work by Michael Farnsworth completed by mid-July. Defendants' Opposing SMF ¶ 8; Supplemental Declaration of Jesse Chunn ("Suppl. Chunn Decl.") (Docket No. 32) (sealed) ¶ 3. Chunn personally worked on computer programming for Pearl from April 2000 through June 22, 2001. Plaintiff's SMF ¶ 9; Declaration of Dennis Daudelin ("First Daudelin Decl.") (Docket No. 21) (sealed) ¶ 5 & Exh. B

---

**3.** Inasmuch as the facts adduced in connection with the Plaintiff's S/J Motion are largely coextensive with those adduced in connection with the Defendants' S/J Motion, for ease of reference I have melded the two into a unified record.

thereto.[4]

The automated trading system that Chunn and Standard developed for Pearl consisted of software that carried out trading of corporate securities without human intervention over alternative trading systems known as electronic communications networks, or ECNs. Defendants' Opposing SMF ¶ 72; Suppl. Chunn Decl. ¶ 35.[5] ECNs are private trading systems maintained separately from public markets such as NASDAQ, although they trade the same securities. Defendants' Opposing SMF ¶ 73; Plaintiff's Reply SMF ¶ 73. They enable buy and sell orders for stocks to be displayed and matched by market professionals and "day-traders." *Id.*

On any given ECN, the various offers for a particular security are displayed as a "book" for that security, with the highest offer to buy (or "bid") and the lowest offer to sell (or "ask") shown at the "top" of the "book." *Id.* ¶ 77. The difference between the highest bid price and the lowest ask price is the "spread" for that security at a given time. *Id.* ¶ 78. ECN arbitrage opportunities are only possible between books on different ECNs. *Id.*

An automated trading system necessarily includes a component that determines when and how the system will enter the market. *Id.* ¶ 80. A system could be programmed to enter the market immediately either by buying a security (*i.e.,* accepting an ask) or by accepting a bid and "selling short," *i.e.,* selling a security that is not yet owned in the expectation that the price will go down and the shares to cover the trade could be purchased later for less. *Id.* Alternatively, rather than accepting an offer to buy or sell, the trading system could place a bid or an ask on the book and wait to see whether that bid or ask was accepted. *Id.* The trading system also must include a component that determines when and how to exit the market, either by selling a security that is owned or buying a security to "cover" a short sale. *Id.* ¶ 81.

Pearl's ATS are modular software systems, meaning that they comprise numerous software components, each of which performs independent functions, but all of which operate as a single system. Plaintiff's SMF ¶ 14; First Daudelin Decl. ¶ 10.[6] Among those various components is a single component, referred to as the "signal generator," that contains the system's trading logic. Plaintiff's SMF ¶ 15; First Daudelin Decl. ¶ 11.[7] This modular ap-

---

4. The material appended as Exhibit B to the Daudelin declaration indicates that Chunn performed this work through June 24, 2001. However, nothing turns on the two-day discrepancy.

5. Pearl's asserted denial of this statement is more in the nature of a qualification: that the "development" included discussions that these software components could be used to run many different trading systems based on different trading methodologies and data sources and were not limited to trading corporate securities. *See* Rule 56(d) Reply to Defendants'/Counterclaimant's Opposing Statement of Material Facts ("Plaintiff's Reply SMF") (Docket No. 42) (sealed) ¶ 72; Supplemental Declaration of Dennis Daudelin ("Suppl. Daudelin Decl.") (Docket No. 43) (sealed) ¶ 2.

6. The Defendants move to strike this statement on the basis that it is so vague and compound that it cannot be admitted or denied. The objection that a statement is "compound," which the Defendants lodge repeatedly throughout their summary-judgment papers, is out of place in the context of a summary-judgment motion. All objections made on that basis accordingly are overruled. Nor is this particular statement so vague that it should be stricken. This objection accordingly also is overruled.

7. The Defendants' attempted qualification of this statement is disregarded inasmuch as it is neither admitted nor supported by a record citation as required by Local Rule 56. *See* Defendants' Opposing SMF ¶ 15.

proach allowed Pearl to execute its business model of conceiving, developing and implementing several systems based on different signal generators, such systems being developed as resources allowed. Plaintiff's SMF ¶ 17; First Daudelin Decl. ¶ 15.[8] Among many possible signal generators, Pearl had the resources to develop only two initial systems. Plaintiff's SMF ¶ 19; First Daudelin Decl. ¶ 16. Other signal-generator concepts were discussed and analyzed to varying degrees and reserved for future development. Plaintiff's SMF ¶ 20; First Daudelin Decl. ¶ 17.[9]

The software for the first system that Standard and Chunn helped develop, "Engine 1," was an "arbitrage" system in that it was designed to purchase a security on one ECN and sell it on a different ECN to profit from the differences in the price of that security in the two different ECNs. Plaintiff's Reply SMF ¶ 74; Suppl. Daudelin Decl. ¶ 3. For example, if one thousand shares of Oracle were selling at 90 on the Island ECN, and someone were simultaneously bidding to buy the same number of shares on the Instanet ECN for 90, there would be an opportunity to buy the shares on Island and sell them on Instanet for a profit of $250, minus commissions. Defendants' Opposing SMF ¶ 75; Plaintiff's Reply SMF ¶ 75. The software developed by Standard automatically both identified such arbitrage opportunities and executed the respective trades. *Id.* ¶ 76.[10]

During the fall of 2000, Standard succeeded in producing the first version of the software to carry out the automated arbitrage transactions. Defendants' SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8. The software was installed on several servers owned by Pearl and located at a computer facility maintained by On–Site Trading, Inc. ("On–Site") in New York. *Id.*[11] On the first day of automated trading, the system generated approximately **[REDACTED]** in revenue. *Id.* During the last four months of 2000, it generated about **[REDACTED]** in revenue. *Id.* Pearl considered acquiring Standard, and a letter of intent was signed on September 15, 2000. *Id.* ¶ 9.

8. The Defendants purport to deny this, but their denial is more in the nature of a qualification—that through at least April 2001 Pearl's business was focused primarily on the development and refinement of the so-called "Engine 1" software to carry out profitable ECN arbitrage, with little attention paid to any other signal generator with the exception of the so-called "BSR system," which consistently lost money. *See* Defendants' Opposing SMF ¶ 17; Suppl. Chunn Decl. ¶ 11.

9. The Defendants qualify this statement, asserting that no one ever said, "Let's reserve that for future development." Defendants' Opposing SMF ¶ 20; Suppl. Chunn Decl. ¶ 14. Instead, according to the Defendants, anything discussed with Pearl in the context of a new system was analyzed and either rejected or Standard was instructed to build it. *Id.*

10. Pearl qualifies this statement, noting that the Engine 1 signal-generator software was only one of several systems Standard and

Chunn assisted Pearl with developing, testing and analyzing. Plaintiff's Reply SMF ¶ 76; Suppl. Daudelin Decl. ¶ 4.

11. The parties dispute the proper characterization of the physical Pearl system. Pearl describes its system as "consist[ing] of a computer network linking Maine to New York." Plaintiff's Opposing SMF ¶ 50; Declaration of Dennis Daudelin ("Second Daudelin Decl.") (Docket No. 37) ¶ 12. The Defendants describe it as a "trading system ... operated from Maine, using a computer that remotely accessed the Pearl network of servers at On–Site in Great Neck, New York." Defendants' Reply Statement of Material Facts in Support of Their Motion for Summary Judgment ("Defendants' Reply SMF") (Docket No. 48) (sealed) ¶ 50; Second Supplemental Declaration of Jesse Chunn ("Second Suppl. Chunn Decl.") (Docket No. 50) (sealed) ¶ 9.

In the meantime, employees of Standard operated the trading system and provided office space for one full-time Pearl employee, Doug Robertson. *Id.* ¶ 10.[12] Standard kept a current backup copy of the software it had developed for Pearl in "SourceSafe" files. *Id.* ¶ 11. While Standard was running the trading system for Pearl, programmer Farnsworth had an established practice of printing and storing daily trading records—a practice that was solely for Pearl's benefit. *Id.* ¶ 12. Pearl conceded that for Standard to print out the trading records, it needed passwords to Pearl's clearing account (as distinguished from passwords to Pearl's computers), which passwords were given to Standard. Defendants' SMF ¶ 42; Plaintiff's Opposing SMF ¶ 42.[13]

By February 2001 the financial conditions for the acquisition had not been met, and the parties' letter of intent expired of its own terms. *Id.* ¶ 13. At a Pearl company meeting on February 16, 2001 several courses of action to reduce Pearl's operating costs were discussed, including moving some or all of Pearl's development work in-house. Plaintiff's Opposing SMF ¶ 14; Second Daudelin Decl. ¶ 41. At the same meeting Daudelin asked: "Should we consider a stock grant for a tighter NDA and non-compete? How much?" Defendants' SMF ¶ 15; Plaintiff's Opposing SMF ¶ 15. By March 2001 the parties had decided not to merge their operations, and Pearl had decided to establish its own separate office and hire its own employees to write software programs and monitor the stock-trading system. *Id.* ¶ 16.[14] In April 2001, Pearl rented its own office space for the first time and moved its equipment out of the Standard offices into the new space. *Id.* ¶ 17. By April, Pearl had also advised Standard that it was winding down its use of Standard's services. *Id.*[15]

12. The Defendants also assert that during this time Standard continued to refine the software and add features to expand its utility and improve its transaction speed. *See* Defendants' SMF ¶ 10; Declaration of Jesse Chunn ("Chunn Decl.") (Docket No. 28) (sealed) ¶ 10. Pearl denies any implication that programming modifications made in early 2001 actually increased the software's utility or improved its transaction speed. *See* Plaintiff's Opposing SMF ¶ 10; Second Daudelin Decl. ¶ 40.

13. The parties dispute whether Farnsworth, a Standard employee, continued to access and view Pearl trading records after Pearl removed Standard's authority to do so. *Compare* Plaintiff's Opposing SMF ¶ 76; Declaration of Michael Dilios (Docket No. 38) ¶¶ 4–10 *with* Defendants' Reply SMF ¶ 76; Second Suppl. Chunn Decl. ¶ 4.

14. Pearl qualifies this statement by denying that it stated or implied that it had terminated or was planning to terminate its use of Standard's programming services. Plaintiff's Opposing SMF ¶ 16; Second Daudelin Decl. ¶¶ 43–45. The Defendants' request to strike this qualification as "extraneous commentary and argument," *see* Appendix, attached to Defendants' Reply SMF, ¶ 16, is overruled.

15. Pearl further states that "Defendants' programming work, particularly the Pearl system upgrade, programmed and implemented in the early part of 2001, was defective in that it had substantial and obvious programming errors that resulted in the system failing to identify and execute upon profitable trading opportunities." Plaintiff's Opposing SMF ¶ 80. The only portion of this statement supported by the citation given is that the upgrade failed to identify and execute profitable trading opportunities. The remainder of the statement accordingly is disregarded. Pearl also asserts that (i) there were numerous discussions between the parties regarding Pearl's needs and Standard's software's suitability to meet those needs, (ii) Standard knew Pearl was relying on its skill in providing software to meet those particular needs, (iii) Standard represented that the software it provided would in fact meet those needs, and (iv) the software did not meet those needs. *See id.* ¶¶ 96–99. The Defendants object that these statements are vague and conclusory, in

■ Although the Pearl arbitrage system was the primary trading "engine" developed by Standard and used by Pearl, it was not the only trading system considered. Defendants' Opposing SMF ¶ 87; Plaintiff's Reply SMF ¶ 87. Standard presented another, non-arbitrage automated trading system to Pearl as a concept. *Id.* Chunn and Standard employee Farnsworth referred to that system as the "Scalper." *Id.* The Scalper was specified to trade a single stock at a time on the Island ECN. Plaintiff's Opposing SMF ¶ 48; Defendants' Reply SMF ¶ 48. Chunn testified at his deposition that he could not recall details of the Scalper system. Plaintiff's SMF ¶ 47; Defendants' Opposing SMF ¶ 47. However, on March 16, 2001 Farnsworth e-mailed to Pearl representatives Daudelin and Robertson a Scalper Design Definition Document and flow chart outlining details of the Scalper system. *Id.; see also* Exh. C to Second Daudelin Decl.[16]

The Scalper Design Definition Document describes the Scalper system as follows:

**[REDACTED]**

Plaintiff's SMF ¶ 49; Defendants' Opposing SMF ¶ 49.

As its trading parameters initially were set up, the Scalper would

**[REDACTED]**

Defendants' Opposing SMF ¶ 91; Plaintiff's Reply SMF ¶ 91; *see also* Suppl. Daudelin Decl. ¶ 12. Pearl specifically informed Standard and Chunn that "any deviation from the document that also creates a working signal is good." Plaintiff's Reply SMF ¶ 89; Suppl. Daudelin Decl. ¶ 10.

Pearl ran simulation testing on the initial parameters of the Scalper and concluded that they would not generate a signal that would result in the desired trading opportunities. Plaintiff's Reply SMF ¶ 87; Suppl. Daudelin Decl. ¶ 9. However, the Scalper system concept **[REDACTED]** was potentially promising. *Id.* The development of new parameters was postponed for budget reasons. *Id.* No software to carry out trading using the Scalper was ever developed by Pearl employees. *Id.*

Because Pearl's business relies on identifying market inefficiencies and/or predictive indicators, it is extremely important to Pearl that few or no other automated trading systems are implemented that might eliminate, reduce or affect a particular inefficiency or market inefficiencies in general. Plaintiff's SMF ¶ 10; First Daudelin Decl. ¶ 6.[17]

particular failing to identify the "needs" in issue. *See* Defendants' Reply SMF ¶¶ 96–99. I sustain the objection. The statements in question are too general to raise a genuine issue on summary judgment and are on that basis disregarded.

16. Given Chunn's inability at deposition to recall details of Scalper, Pearl seeks to preclude the Defendants from relying on portions of subsequent affidavits in which Chunn demonstrated a "newfound" recollection of the program's details. *See* Plaintiff's Reply in Support of Motion for Partial Summary Judgment of Liability on Counts I and V of the Complaint and for Summary Judgment on Counterclaims ("Plaintiff's S/J Reply") (Dock-

et No. 41) (sealed) at 3–4 & n. 4. Inasmuch as Pearl identifies no substantive direct contradiction between the earlier and later testimony, *see id.*, the objection is overruled, *see Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20 (1st Cir.2000) ("It is settled that when an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

17. Pearl further asserts that it is extremely important to it that there be few or no other automated trading systems that would affect an indicator or indicators in general; howev-

Daudelin, Pearl's chief executive officer, made it clear to Standard employees (including Chunn) on several occasions that the existence of Pearl's ATS and all aspects of it, including various signal generators and related components, constituted proprietary and confidential information owned by Pearl. Plaintiff's SMF ¶ 22; First Daudelin Decl. ¶¶ 1, 21.[18] Pearl has not made any patent applications relating to its trading methodologies or systems. Plaintiff's SMF ¶ 24; Defendants' Opposing SMF ¶ 24. In its copyright applications related to computer programs for its trading methodologies, Pearl has carefully excised any trade secrets about exactly how the trading methodologies work. Plaintiff's SMF ¶ 26; First Daudelin Decl. ¶ 25.[19]

On April 10, 2000, prior to the disclosure of any details about Pearl's methods to Chunn, Chunn signed a non-disclosure and confidentiality agreement ("NDA"). Plaintiff's SMF ¶ 29; Defendants' Opposing SMF ¶ 29. The NDA provides, in part:

I agree to make full and prompt disclosure to the Company [Pearl] of all business opportunities relating to manual and automated stock market trading and any other businesses in which the Company may be engaged during the course of my contract with the Company, (collectively, "Business Opportunities"), as well as of all computer software systems, methods, designs, processes, algorithms and trade secrets whether patentable, copyrightable or not, made, conceived or reduced to

practice by me or under my direction or jointly with others during the term of my contract with the Company (all of which are collectively termed "Discoveries"). I hereby assign and transfer to the Company without further compensation the entire worldwide right, title and interest in and to all Discoveries and any patents, patent applications, copyrights, copyright registrations, or trade secrets covering such Discoveries . . . .

*Id.* ¶ 31. The NDA also provides:

I understand that the Company's confidential information includes matters not generally known outside the Company, such as computer software systems, object and source code, methods, designs, processes, algorithms and trade secrets relating to manual and automated stock market trading including business operations, methodologies and the techniques of the Company. I further understand that while I am under contract by the Company, I may obtain or hear of confidential information of the Company and of other parties, which has been provided to the Company in confidence. I agree not to disclose, use or copy any confidential information of the Company (whether or not produced by me) or of other parties, which has been provided to the Company in confidence, except as the Company may authorize or direct.

*Id.* ¶ 32; *see also* NDA, Exh. E to First Daudelin Decl., § I. Section III of the NDA provides that ownership of copy-

---

er, Standard and Chunn deny this. *Compare* Plaintiff's SMF ¶ 10; First Daudelin Decl. ¶ 6 *with* Defendants' Opposing SMF ¶ 10; Suppl. Chunn Decl. ¶ 5.

**18.** The Defendants qualify this statement, asserting that (i) it was clear that Daudelin and Pearl considered the existence of the automated arbitrage system to be confidential and proprietary because if another arbitrage sys-

tem attempted to exploit the same market inefficiencies, it would adversely affect the performance of Pearl's system, but (ii) the same cannot be said for other, non-arbitrage trading systems. *See* Defendants' Opposing SMF ¶ 22; Suppl. Chunn Decl. ¶ 16.

**19.** The Defendants' objection to this statement on the basis of vagueness, *see* Defendants' Opposing SMF ¶ 26, is overruled.

rights and other intellectual property rights "in the designs, drawings, and related documents and works of authorship created for the Company or within the scope of my contacts with the Company belong to the Company exclusively throughout the world." Defendants' SMF ¶ 46; NDA, Exh. E to First Daudelin Decl., § III.[20] The NDA also provides that the obligations thereunder "shall survive any termination of contracts with the Company." Plaintiff's SMF ¶ 33; NDA, Exh. E to First Daudelin Decl., § VIII.[21]

The following employees of Standard also signed one or more nondisclosure agreements: Mike Farnsworth, Janet Chunn, Sue Davidson, Marc Grover and Michael Moore. Plaintiff's SMF ¶ 34; First Daudelin Decl. ¶ 29 & Exhs. F–J thereto. Janet Chunn, the controller of Standard, signed an NDA purportedly on behalf of Standard on April 24, 2000. Plaintiff's Opposing SMF ¶ 85; Second Daudelin Decl. ¶ 28 & Exh. F thereto.[22] Pearl also required that On–Site, then its broker, execute a confidentiality agreement. Plaintiff's SMF ¶ 35; First Daudelin Decl. ¶ 30 & Exh. K thereto.

Prior to being hired by Pearl, Standard and Chunn had never worked with or developed any automated stock-trading systems. Plaintiff's SMF ¶ 37; Defendants' Opposing SMF ¶ 37. Chunn opened a trading account with On–Site and deposited money to fund the account on March 29, 2001. Defendants' Opposing SMF ¶ 39; Exh. O to First Daudelin Decl.[23] Before On–Site would agree to open Chunn's account, it insisted that Pearl give its consent. Defendants' SMF ¶ 19; Plaintiff's Opposing SMF ¶ 19. Daudelin gave that consent on Pearl's behalf. *Id.*[24] Chunn purchased a server with his own money and had it delivered to On–Site. *Id.* ¶ 20. He directed On–Site that it should maintain his server separate and apart from the equipment being stored for Pearl. *Id.* On–Site agreed to that request. *Id.*

Chunn wrote his software on the server he had installed at On–Site using a remote utility program that enabled him to connect over the Internet from his office and computer at Standard. Defendants' SMF ¶ 27; Chunn Decl. ¶ 25; *see also* Defendants' Reply SMF ¶ 77; Second Suppl.

---

**20.** Pearl attempts to qualify this statement by noting that it contains only a partial quotation from section III, denying that section III places no additional restrictions on Chunn and denying that the NDA does not bind Standard. *See* Plaintiff's Opposing SMF ¶ 46. I agree with the Defendants that this is extraneous commentary and argument (rather than "fact") and disregard it on that basis. *See* Appendix ¶ 46.

**21.** The Defendants' objection that, to the extent the statement incorporates more than the text of the NDA it is argument rather than fact, *see* Defendants' Opposing SMF ¶ 33, is overruled. The statement accurately reflects the underlying text.

**22.** Pearl's further statement that Janet Chunn had "the apparent authority to sign binding contracts on behalf of Standard I/O," Plaintiff's Opposing SMF ¶ 85, is disregarded on the basis that it is conclusory, as noted by the

Defendants, *see* Defendants' Reply SMF ¶ 85. The Defendants qualify paragraph 85, stating that Janet Chunn had no authority to bind Standard. Defendants' Reply SMF ¶ 85; Second Suppl. Chunn Decl. ¶ 5.

**23.** This account was opened in the names of both Chunn and his wife. Defendants' SMF ¶ 18; Plaintiff's Opposing SMF ¶ 18.

**24.** Pearl qualifies this statement by denying that in so consenting Pearl stated or implied that Chunn could conduct any automated trading or use confidential information or trade secrets owned by Pearl. Plaintiff's Opposing SMF ¶ 19; Second Daudelin Decl. ¶¶ 36–37. The Defendants' request to strike this qualification on the basis that it constitutes extraneous commentary and argument, *see* Appendix ¶ 19, is denied.

Chunn Decl. ¶ 11.[25] Chunn insisted on keeping his personal trading system separate from work being performed by others at Standard. Defendants' SMF ¶ 22; Chunn Decl. ¶ 20.[26] Working on his own time, Chunn created software for his own experimental automated trading system. Defendants' SMF ¶ 23; Chunn Decl. ¶ 21.[27]

Chunn described his trading system as follows:

> Well, the way it was going to work some day was it would look at the number of shares that—the number of shares that—excuse me, it has been awhile. I've got to remember. The number of executions—the number of shares executed on the buy side of the book for a specific symbol versus the number of shares executed on the sell side of the book for that same symbol, and whether or not those executions were happening on the buy side or on the sell side.

> So that if most executions happened on the buy side, my theory was, and this never came to fruition because I didn't have enough time, but the theory was that since more people were coming over to the buy side—it has been a long time. If more people were executing at the price the buyers were offering to pay, then the price was going to go down. If more executions were happening at the price that the sellers were offering to sell for, then the price would go up. I may have that backwards. Again, it has been a long time. I never did get it to work. That's how it works, although I might have it in reverse. And, of course, there was a lot more to it, but that was the basic premises.

Plaintiff's SMF ¶ 42; Deposition of Jesse W. Chunn ("Chunn Dep.") (sealed), filed with Plaintiff's SMF, at 92–93.[28]

Chunn's ATS was programmed to trade only on the Island ECN. Plaintiff's SMF

**25.** The Defendants further state that because Chunn's server was represented by On–Site to be in a private, secure facility, he did not create a copy of his program as he was developing it. Defendants' SMF ¶ 27; Chunn Decl. ¶ 25. Pearl denies that this could be so, citing expert testimony to the effect that it would be surprising, if not unimaginable, that a programmer would fail to back up a potentially lucrative program. Plaintiff's Opposing SMF ¶ 27; Deposition of Patrick M. Tormey ("Tormey Dep."), attached thereto, at 67; Examination Before Trial of Richard Ceglio ("Ceglio Dep."), attached thereto, at 70.

**26.** Pearl's attempted denial of this statement, *see* Plaintiff's Opposing SMF ¶ 22, is disregarded inasmuch as it is neither admitted nor supported by the citation given. The parties dispute whether Standard employee Farnsworth performed work on Chunn's automated trading system in his capacity as a Standard employee. *Compare* Plaintiff's Opposing SMF ¶ 75; Deposition of Michael W. Farnsworth ("Farnsworth Dep."), attached thereto, at 45 *with* Defendants' Reply SMF ¶ 75; Rule 30(b)(6) Deposition of Standard I/O, Inc.

through its designee Jesse Chunn, attached to Second Supplemental Declaration of Robert H. Stier, Jr. ("Second Suppl. Stier Decl.") (Docket No. 49) (sealed), at 8.

**27.** Pearl denies the implication that this software was not derived from Pearl's confidential and trade secret information. *See* Plaintiff's Opposing SMF ¶ 23; Farnsworth Dep., attached thereto, at 23–24. The Defendants' objection that this denial constitutes extraneous argument and commentary, *see* Appendix ¶ 23, is overruled.

**28.** As in the context of Scalper (discussed above), Pearl seeks to preclude the Defendants from relying on portions of subsequent affidavits in which Chunn demonstrated a "newfound" recollection of his own ATS program's details, including characteristics allegedly distinguishing it from the Scalper. *See* Plaintiff's S/J Reply at 3–4 & n. 4. Again, inasmuch as Pearl identifies no substantive direct contradiction between the earlier and later testimony, *see id.*, the objection is overruled, *see Torres,* 219 F.3d at 20.

¶ 50; Defendants' Opposing SMF ¶ 50. **[REDACTED]**

Chunn carried out the first manual trades using his system on April 12, 2001. Defendants' SMF ¶ 28; Plaintiff's Opposing SMF ¶ 28. He did not begin to trade automatically until on or about May 18, 2001. *Id.*[29] In all, Chunn traded stock manually and automatically using his system on twenty-eight separate days between April 12 and October 23, 2001. *Id.* ¶ 30. In that time, he traded only three stocks: **[REDACTED]**. *Id.*[30] All automated trades were conducted over the same ECN; there was no arbitrage. *Id.* Chunn lost a total of $9,274.79 as a result of these transactions. *Id.* ¶ 31. Chunn and his wife—not Standard—reported the losses from use of the trading system on their personal tax returns. *Id.*

Pearl never authorized Standard or Chunn to develop an automated trading system or to use any of Pearl's trading concepts or software. Plaintiff's SMF ¶ 51; First Daudelin Decl. ¶ 34; Defendants' Responses to Plaintiff's First Set of Requests for Admissions and Interrogatories (sealed), filed with Plaintiff's SMF, ¶ 17 at 13–14.[31] Pearl never implicitly nor explicitly consented to Standard's or Chunn's use of any Pearl trade secrets. Plaintiff's SMF ¶ 52; First Daudelin Decl. ¶ 34.[32] For the only trades that Chunn carried out, he did not need, and went out of his way not to use, the specific software components that Pearl ultimately identified as trade secrets: **[REDACTED]**, the execution system, the broker system, the feed parser system and the control panel and node manager. Defendants' SMF ¶ 25; Chunn Decl. ¶ 23.[33]

In early November 2001, On–Site's assets were sold to A.B. Watley ("ABW"), a New York-based brokerage house. Defendants' SMF ¶ 32; Plaintiff's Opposing SMF ¶ 32. At about that time, Douglas Robertson, Pearl's chief technology officer, telephoned Tim Reynolds, a network engineer for ABW, and asked him to install a Linux operating system on Pearl's Pionex server. Plaintiff's SMF ¶ 53; Defendants' Opposing SMF ¶ 53. Reynolds told Rob-

---

29. The Defendants assert that Chunn developed his trading system after being advised that Pearl was going a separate way and winding down its use of Standard's services. Defendants' Opposing SMF ¶ 100; Suppl. Chunn Decl. ¶ 63. Pearl denies this, stating that Pearl did not indicate to Standard that it might be winding down the relationship until sometime in April 2001, while the Scalper was conceived and initially developed no later than March 16, 2001, the date the Scalper documentation was sent to Pearl. Plaintiff's Reply SMF ¶ 100; Second Daudelin Decl. ¶ 43; Suppl. Daudelin Decl. ¶ 9.

30. Pearl attempts to qualify this statement with the assertion that it had determined that [REDACTED] stocks were particularly attractive for automated stock trading and had shared this information with the Defendants, *see* Plaintiff's Opposing SMF ¶ 30; however, this assertion is disregarded inasmuch as it is neither admitted nor, in the main, supported by the citation given.

31. The Defendants qualify this statement, asserting that Chunn did not require authorization from Pearl to develop an automated trading system and did not need or use Pearl's trading concepts or software. Defendants' Opposing SMF ¶ 51; Suppl. Chunn Decl. ¶ 27.

32. The Defendants qualify this statement, noting that the use of any trade secrets never came up in discussion between the parties. Defendants' Opposing SMF ¶ 52; Suppl. Chunn Decl. ¶ 28.

33. Pearl attempts to deny this statement, *see* Plaintiff's Opposing SMF ¶ 25, but its denial is not fairly supported by the citations given, which do not clearly demonstrate that Chunn made use of the specific components in issue. The denial is on that basis disregarded.

ertson that he had installed the Linux operating system, but Robertson connected to the server and found no evidence of the installation. *Id.* ¶ 54. In a subsequent telephone conversation, Reynolds asked Robertson which Pionex server he was to install the Linux system on. Plaintiff's SMF ¶ 55; Declaration of Douglas Robertson ("First Robertson Decl.") (Docket No. 22) (sealed) ¶ 6. Because Pearl had only one Pionex server, this led Pearl to discover that Reynolds had installed Linux on a server other than Pearl's. *Id.*[34] The server was plugged into Pearl's KVM (keyboard, video, mouse) box and router. Plaintiff's SMF ¶ 56; First Daudelin Decl. ¶ 38.[35] The purpose of the router at the ABW facility was to control access to Pearl's computer network. Plaintiff's Opposing

SMF ¶ 60; Declaration of Douglas Robertson ("Second Robertson Decl.") (Docket No. 36) ¶ 14.[36]

On–Site provided hardware racks and IP ports for each user to connect to its system. Plaintiff's Opposing SMF ¶ 59; Defendants' Reply SMF ¶ 59.[37] Pearl had not authorized the connection of any additional servers to the Pearl network. Plaintiff's Opposing SMF ¶ 54; Second Daudelin Decl. ¶ 50. Pearl's ATS operates and executes trades in the millisecond range and, therefore, is extremely dependent upon operating on maximum speed and efficiency, as has been demonstrated by internal experimentation. Plaintiff's Opposing SMF ¶ 57; Second Daudelin Decl. ¶¶ 23–24.[38]

34. Pearl's further assertion that Reynolds installed the Linux system on "an unauthorized server" located on "Pearl's private network," Plaintiff's SMF ¶ 55, is disputed by the Defendants, who state that the network (which was intended for up to five separate customers) was owned initially by On–Site, not Pearl, and that Chunn's server was authorized by On–Site and ABW, which took money from Chunn for his use of it, *see* Defendants' Opposing SMF ¶ 55; Ceglio Dep., attached to Plaintiff's SMF, at 42–46, 55–56; Suppl. Chunn Decl. ¶ 29.

35. The Defendants' request to strike this statement on the basis that it is argument and is vague with respect to time, *see* Defendants' Opposing SMF ¶ 56, is overruled. The statement is fact, not argument, and makes reasonably clear that it pertains to the alleged state of the server as of the time Pearl discovered it. The Defendants alternatively attempt to deny the statement with assertions that are more in the nature of a qualification: that, to Chunn's knowledge, his server never was plugged into any component belonging to Pearl while at On–Site, and there was no need for his server to be connected to the Pearl KVM box. Defendants' Opposing SMF ¶ 56; Suppl. Chunn Decl. ¶ 30.

36. Pearl further states, "By connecting their computer to that router and configuring the router with a 'tunnel,' that is, a secure connection, to Chunn's computer, defendants

were able to circumvent the protections that Pearl intended by installing the router." Plaintiff's Opposing SMF ¶ 60 (citing Second Robertson Decl. ¶ 15). I agree with the Defendants that this statement is conclusory and that the declarant (Pearl's technology officer) demonstrates no basis in personal knowledge for the assertion that Standard or Chunn was responsible for the plug-in to Pearl's router. *See* Defendants' Reply SMF ¶ 60. This additional statement accordingly is disregarded.

37. The parties dispute whether the users alone physically connected their systems into On–Site's ports, or did so with aid from On–Site. *Compare* Plaintiff's Opposing SMF ¶ 59; Examination Before Trial of Robert Provenzano ("Provenzano Dep."), attached thereto, at 8–9 *with* Defendants' Reply SMF ¶ 59; Provenzano Dep.at 9; Ceglio Dep., attached to Plaintiff's Opposing SMF, at 42–43.

38. The Defendants object to this statement on the basis that references to millisecond trades and internal experimentation are hearsay as to which Daudelin is not competent to testify. *See* Defendants' Reply SMF ¶ 57. The objection is overruled. The Defendants provide no reason to doubt the competency of Daudelin, as chief executive officer of Pearl, to testify as to internal experimentation within Pearl and the importance of the speed with which its trades were executed.

After consulting with legal counsel, and with the sole intent of preserving the suspect server for legal proceedings, Daudelin drove to ABW's premises on November 15, 2001, took pictures of the server (which was unplugged and shut down before he arrived) and the networking hardware to which it was connected, removed the server and returned to his home in Harvard, Massachusetts. Plaintiff's SMF ¶ 58; First Daudelin Decl. ¶ 38. As it turned out, the Linux software was installed on Chunn's server, overwriting his hard drive and obliterating his programming code. Defendants' SMF ¶ 33; Videotape Deposition of Dennis Daudelin, attached to Second Suppl. Stier Decl., at 64–66; Tormey Dep., Exh. S5 to Declaration of Robert H. Stier, Jr. ("Stier Decl.") (Docket No. 29) (sealed) at 40–41. Pearl had not authorized Standard or Chunn to use any element of Pearl's network or server, to view any Pearl data or to develop or operate an automated trading system. Plaintiff's Opposing SMF ¶ 56; Defendants' Reply SMF ¶ 56. After discovering that the server was owned by Chunn, Pearl's legal counsel tried over the ensuing several weeks to reach agreement with Chunn's legal counsel on the best manner to preserve any evidence contained on the hard disk drive ("HDD") within the server. Plaintiff's SMF ¶ 59; First Daudelin Decl. ¶ 39.[39]

Counsel for Chunn provided proof of Chunn's ownership and demanded the return of his server beginning on December 14, 2001. Defendants' Opposing SMF ¶ 110; Plaintiff's Reply SMF ¶ 110. In early January 2002, Daudelin delivered the server to Pearl's counsel. Plaintiff's Opposing SMF ¶ 63; Defendants' Reply SMF

¶ 63. Prior to doing so, Daudelin removed the HDD from the server and delivered it to Pearl's counsel at the same time he delivered the server. *Id.* ¶¶ 64–65. Counsel for Pearl placed the HDD in a secure location and informed counsel for Standard and Chunn that it could pick up the server (without the HDD) while the parties attempted to agree on the best manner to preserve any evidence contained on the HDD. *Id.* ¶ 70. In early January 2002, Pearl purchased a replacement hard disk drive and delivered it to counsel for Standard and Chunn. *Id.* ¶ 71. On January 9, 2002 counsel for Pearl delivered the server (without the HDD) to counsel for Standard and Chunn. *Id.* ¶ 72.

On February 4, 2002 counsel for Pearl sent the HDD that was removed from Chunn's server to Pearl's expert for imaging, with explicit instructions that no information on the drive was to be accessed or viewed in any way. *Id.* ¶ 66. Pearl's expert made a duplicate copy of the HDD, and the original HDD was returned to counsel for Pearl, who retained the drive in a secure location until a protective order was agreed to by the parties. *Id.* ¶¶ 67, 73. Only after Pearl's expert executed a protective order on September 24, 2002 was the expert instructed to perform any forensic analysis of the drive. *Id.* ¶ 68.

▮ The original HDD was returned to the Defendants' counsel on October 24, 2002 in response to a discovery request by the Defendants. Plaintiff's Reply SMF ¶ 112; Declaration of James Keenan (Docket No. 40) ¶ 2 & Exh. A thereto. At no point did any employee of Pearl turn on, boot up or in any way access the server

---

**39.** The Defendants qualify this statement, asserting that counsel for Chunn repeatedly demanded the return of all of Chunn's property and offered to preserve the HDD as evidence. Defendants' Opposing SMF ¶ 59; Supplemental Declaration of Robert H. Stier, Jr.

("Suppl. Stier Decl.") (Docket No. 33) (sealed) ¶¶ 2–4 & Exhs. S9–S11 thereto. Only after Chunn filed suit did Pearl return a portion of his property. Defendants' Opposing SMF ¶ 59; Suppl. Stier Decl. ¶ 6.

or the HDD or view the contents of the HDD. Plaintiff's SMF ¶ 63; First Daudelin Decl. ¶ 42.[40]

In late November 2001, shortly after Chunn's server was seized by Daudelin, Chunn was informed by ABW employee Matt Ventura that the company no longer wanted his business and was terminating his account. Defendants' Opposing SMF ¶ 109; Plaintiff's Reply SMF ¶ 109. Chunn had done nothing to ABW to cause it to terminate his account, which was profitable for ABW. Defendants' Opposing

SMF ¶ 105; Suppl. Chunn Decl. ¶ 67.[41] He paid commissions on the trades that he conducted, which produced revenues for ABW. Id.[42] There is no evidence that Pearl or Daudelin used fraud or intimidation to cause ABW to sever its relationship with Chunn. Plaintiff's SMF ¶ 66; Chunn Dep., filed with Plaintiff's SMF, at 126–27.[43]

In just over a year, from the end of September 2000 through the end of October 2001, the total value of securities sold

**40.** The Defendants attempt to deny this statement by essentially casting doubt on Pearl's credibility, asserting that there is no way to determine whether the HDD was accessed after Daudelin removed it from ABW. See Defendants' Opposing SMF ¶ 63; Deposition Upon Oral Examination of David P. Stenhouse, Exh. S6 to Stier Decl., at 34–36. This statement effectively qualifies, rather than controverts, Pearl's statement. The Defendants also request (without citation to authority) that the contents of the HDD and all testimony relating thereto be excluded in view of Daudelin's alleged illegal seizure and retention of that evidence. See Defendants' Opposing SMF ¶ 63. ·There is no indication that the Defendants seek this exclusion as a type of sanction. See id. To the extent the request is premised on a possible defect in chain of custody, it goes to the weight rather than the admissibility of the evidence. See, e.g., United States v. Scharon, 187 F.3d 17, 22 (1st Cir. 1999). To the extent it is premised on asserted spoliation of the evidence, see Defendants' S/J Motion at 7–9, I reject it for reasons discussed below in section III(A) of this recommended decision.

**41.** Pearl attempts to deny this, see Plaintiff's Reply SMF ¶ 105, but the facts it sets forth do not effectively controvert the statement.

**42.** Daudelin and Pearl assert that Daudelin, the only Pearl employee to discuss Chunn's server with ABW, at no time ever asked, demanded or suggested that ABW sever its relationship with Chunn. Plaintiff's SMF ¶ 64; First Daudelin Decl. ¶ 43. The Defendants deny this statement by reference to a portion of an affidavit in which Chunn stated: "While I did not participate in any discussions between Daudelin and A.B. Watley, and al-

though no one from ABW has provided any testimony, I do know that shortly after Daudelin seized my server on November 15, 2001, I was told by ABW that my account was being terminated and that they no longer wanted my business." Defendants' Opposing SMF ¶ 64; Suppl. Chunn Decl. ¶ 31.

**43.** The Defendants attempt to deny this statement by reference to a portion of an affidavit in which Chunn stated: "ABW had no reason to terminate its relationship with me since I was a good paying customer. Daudelin's intervention is the only circumstance that made me stand out from other ABW customers as one to be singled out, coincidentally at the same timeframe that he took my server." Defendants' Opposing SMF ¶ 66; Suppl. Chunn Decl. ¶ 32. Pearl and Daudelin assert that the attempted denial is ineffective inasmuch as Chunn lays no foundation for personal knowledge of the universe of potential reasons ABW may have had for terminating the contract in issue and, hence, the statement amounts to speculation. See Plaintiff's S/J Reply at 5–6. I agree and on that basis disregard the denial. Standard and Chunn also assert, and Pearl and Daudelin deny, that Daudelin (i) was frequently observed to threaten On–Site representatives with pulling Pearl's business if his demands were not met, (ii) on one occasion, Daudelin tried to bully and intimidate Standard employee Farnsworth to the point that Farnsworth had to leave work and (iii) Daudelin attempted to intimidate Chunn with unreasonable demands. Compare Defendants' Opposing SMF ¶¶ 102–04; Suppl. Chunn Decl. ¶¶ 64–66 with Plaintiff's Reply SMF ¶¶ 102–04; Suppl. Daudelin Decl. ¶¶ 14–16.

by Pearl through On–Site was approximately [**REDACTED**]. Defendants' Opposing SMF ¶ 106; Plaintiff's Reply SMF ¶ 106. The total value of securities purchased was approximately the same. *Id.* One could assume conservatively that the average price per share of a NASDAQ security traded by Pearl during this period was less than $50. *Id.* ¶ 107. One also could assume conservatively that Pearl paid a commission of at least $1 for each one hundred shares traded. *Id.* ¶ 108.

Pearl's experts have determined that the installation of the Linux operating system on the HDD destroyed all the files on it. Plaintiff's SMF ¶ 68; Defendants' Opposing SMF ¶ 68. As a result, there is no

confidential information about Chunn's trading system on the server. *Id.* ¶ 69.[44] No "files copied from Pearl's ATS" were found on Chunn's hard drive, as Pearl's experts admit. Defendants' SMF ¶ 37; Plaintiff's Opposing SMF ¶ 37.[45] Pearl's technical expert, Pat Tormey, retrieved GUIDs from the remnants of the HDD identifying discrete components of Pearl's software. Plaintiff's Opposing SMF ¶ 81; Tormey Dep., attached thereto, at 97–99.[46] These GUIDs were installed on the HDD prior to the installation of the Linux operating system and the overwriting of the HDD. Plaintiff's Opposing SMF ¶ 82; Tormey Dep., attached thereto, at 97–99, 113.[47]

**44.** I sustain the Defendants' objection to the following statement, and accordingly disregard it, on grounds that it is vague and conclusory: "Pearl has been injured and the Defendants have been unjustly enriched as a result of Defendants' acts." *See* Plaintiff's SMF ¶ 70; Defendants' Opposing SMF ¶ 70; *see also, e.g., Shorette v. Rite Aid of Me., Inc.,* 155 F.3d 8, 12 (1st Cir.1998) (non-movant may not rely on "conclusory allegations, improbable inferences, and unsupported speculation" to defeat motion for summary judgment) (citation and internal quotation marks omitted). The parties dispute whether Chunn has no estimate of his own counterclaim damages and no means to compute them. *Compare* Plaintiff's SMF ¶ 71; Chunn Dep., filed with Plaintiff's SMF, at 130–32 *with* Defendants' Opposing SMF ¶ 71; Suppl. Chunn Decl. ¶ 34.

**45.** Pearl attempts to deny that there were no such files (*i.e.,* copied from Pearl's ATS) on the HDD prior to the Linux installation, *see* Plaintiff's Opposing SMF ¶ 37; however, this qualification is disregarded inasmuch as the citation given does not make clear that so-called globally unique identifiers ("GUIDs") found on the HDD were traceable to Pearl's ATS. The parties dispute whether Standard employee Farnsworth used one of Pearl's components to test the Defendants' automated trading system. *Compare* Plaintiff's Opposing SMF ¶ 76; Farnsworth Dep., attached thereto, at 115 *with* Defendants' Reply SMF

¶ 76; Farnsworth Dep., attached to Plaintiff's Opposing SMF, at 81.

**46.** Pearl's characterization of the GUIDs as identifying components of its "automated trading system modules," Plaintiff's Opposing SMF ¶ 81, is disregarded inasmuch as it is not supported by the citation given. With this modification, the Defendants' objection to the entirety of the statement on the ground that it is vague and conclusory, *see* Defendants' Reply SMF ¶ 81, is overruled. The Defendants, alternatively, qualify the statement, asserting that Tormey testified that he searched for five "enum" files and that he located GUIDs for four of those five files in the unallocated space on the HDD. *Id.;* Tormey Dep., attached to Second Suppl. Stier Decl., at 97–101.

**47.** Pearl's further statement that these GUIDS "establish to a near mathematical certainty that certain components from Pearl's automated trading system were installed on Defendants' hard disk drive," Plaintiff's Opposing SMF ¶ 82, is disregarded inasmuch as it is not supported by the citations given. With this portion excised, the Defendants' opposition to the statement on the basis of vagueness and conclusoriness, *see* Defendants' Reply SMF ¶ 82, is overruled. In a separate statement, Pearl also asserts that the "copyrights to the software components and files found on Defendant's [sic] hard disk drive (as established by the GUIDs noted above) were all protected via copyright registrations filed with the United States Copyright Office on

## III. Analysis

### A. Count I of Complaint: Misappropriation of Trade Secrets

In Count I of its complaint, Pearl alleges that the Defendants disclosed and used trade secrets without its consent in violation of two sections of the Maine Uniform Trade Secrets Act ("UTSA"), 10 M.R.S.A. §§ 1543–44. Complaint ¶¶ 92–101. The parties cross-move for summary judgment as to this count. *See, e.g.,* Plaintiff's S/J Motion at 1; Defendants' S/J Motion at 1.[48] Drawing all reasonable inferences against the grant of summary judgment, I find Standard entitled to prevail as to the entirety of Count I and Chunn entitled to prevail as to any asserted violation of the UTSA premised on the existence of certain GUIDs on his HDD.

■ I turn first to the matter of Standard's potential liability. As Pearl clarifies in its summary-judgment papers, it premises its UTSA claim on the creation of the Chunn ATS. *See, e.g.,* Plaintiff's S/J Motion at 12–15; Plaintiff's S/J Opposition at 5. It argues (without citation to authority) that Standard should be held liable for any asserted misappropriation on grounds that (i) Chunn owns all of Standard's assets, (ii) Chunn admits to using Standard's office and pieces of office equipment (*e.g.,* his computer) in creating the Chunn ATS and (iii) Farnsworth was paid regular Standard salary to work on the Chunn ATS. *See* Plaintiff's S/J Opposition at 5. The latter asserted fact is disputed; however, even

assuming *arguendo* its truth, the existence of these three facts, standing alone, is insufficient to hold Standard liable for any misappropriation.

■ Pearl does not explain how, and I fail to see how (in the absence of a piercing-of-the-corporate-veil type of argument), the bare fact of Chunn's ownership of Standard is relevant. Chunn's use of some of Standard's property and one of its employees to create the Chunn ATS is relevant; however, it is not dispositive. As the Defendants point out, "[u]nder Maine law, a servant's tort is committed in the scope of employment only if it is actuated, at least in part, by a purpose to serve the master." Reply Memorandum in Support of Motion for Summary Judgment by Standard I/O, Inc. and Jesse Chunn ("Defendants' S/J Reply") (Docket No. 47) (sealed) at 2 (quoting *Nichols v. Land Transport Corp.,* 223 F.3d 21, 24 (1st Cir. 2000)). Thus, "actions that are done with a private, rather than a work-related, purpose to commit wrongdoing are outside the scope of employment." *Id.* (quoting *Bergeron v. Henderson,* 47 F. Supp.2d 61, 66 (D.Me.1999)).

It is undisputed that Chunn opened the On–Site account in the name of himself and his wife, that he paid for the server used to develop the Chunn ATS with his own money and that he and his wife, not Standard, reported losses from trading on the system on their taxes. On the cognizable evidence, a reasonable fact-finder could draw only one conclusion: that Chunn's

---

February 5, 2002." Plaintiff's Opposing SMF ¶ 83. However, inasmuch as the citations given do not establish that particular GUIDs identified on the HDD correlate to software components protected by copyright registration, it is disregarded.

48. Technically, Pearl moves for summary judgment only against Chunn as to this count. *See* Plaintiff's S/J Motion at 1. However, in

opposing the Defendants' cross-motion for summary judgment, it suggests that entry of summary judgment in its favor as against Standard would be appropriate. *See* Plaintiff's Opposition to Defendants'/Counterclaimants' Motion for Summary Judgment, etc. ("Plaintiff's S/J Opposition") (Docket No. 34) (sealed) at 5.

use of some Standard property and the time of a Standard employee was incidental to a private purpose—the development of an ATS in the name of, and for the benefit of, himself and his wife, not of Standard. Thus, even assuming *arguendo* that Chunn misappropriated Scalper trade secrets in developing the Chunn ATS, Standard cannot be held liable for his misdeeds. It accordingly is entitled to summary judgment as to Count I.

This leaves Chunn and Pearl, to whom I now turn. Pearl predicates its UTSA claim on (i) similarities between the Scalper system and the Chunn ATS and (ii) the presence on the HDD of GUIDs from Pearl's ATS. *See, e.g.*, Plaintiff's S/J Motion at 12–15; Plaintiff's S/J Reply at 4–5; Plaintiff's S/J Opposition at 7–9. Neither side demonstrates entitlement to summary judgment with respect to the Scalper theory; however, I find that Pearl fails to generate a triable issue with respect to the HDD.

■ Turning first to the Scalper, there is (as the Defendants suggest) a threshold triable issue whether Pearl owned the Scalper concept—an assertion that hinges on operation of the "Discoveries" section of the NDA. *See* Defendants' S/J Reply at 3–4. Per the terms of the NDA executed by Chunn, he assigned to Pearl such systems, methods, designs and so forth as were "conceived or reduced to practice by me or under my direction or jointly with others during the term of my contract with the Company." Plaintiff's SMF ¶ 31; Defendants' Opposing SMF ¶ 31. There is no evidence of the existence of any written contract between Chunn and Pearl apart

from the NDA. Nor is it clear that the two formed any separate oral agreement.[49] These circumstances create an ambiguity as to the meaning of the phrase, "during the term of my contract with the Company." *See, e.g.*, *Villas by the Sea Owners Ass'n v. Garrity*, 748 A.2d 457, 461 (Me. 2000) ("When a contract is found to be ambiguous, a court may look to extrinsic evidence of the intent of the parties. Additionally, the court may look to extrinsic evidence to reveal a latent ambiguity.") (citations omitted). While the parties adduce sufficient extrinsic evidence to reveal the ambiguity, they do not adduce sufficient evidence to resolve it. A trier of fact accordingly must do so.[50]

Further, even assuming *arguendo* that Pearl owns the Scalper concept or methodology, there is no direct evidence that Chunn misappropriated it. Pearl therefore relies (as it may) on the existence of similarities between the Scalper and the Chunn ATS to prove the wrongful act. However, the parties dispute the extent to which the concepts differ, and that dispute must be resolved before a trier of fact rationally can infer whether Chunn did or did not base his ATS on the Scalper.

■ I turn next to the HDD theory, which amounts to an assertion that Chunn essentially copied parts of the so-called "Engine 1" ATS (a working program) rather than the Scalper (a design concept that Pearl did not translate into a program). As an initial matter, Chunn argues that the HDD evidence (and any inferences therefrom) should be excluded on the basis that Pearl or its agents were responsible

---

49. Pearl itself describes the programming contract as having been made with Standard. *See* Plaintiff's SMF ¶ 7.

50. There is, in addition, a triable issue whether Standard executed a binding NDA pursuant to which ownership of the Scalper would

have been transferred to Pearl. Janet Chunn, Standard's controller, seemingly signed an NDA on behalf of the company. However, the Defendants assert that she intended to sign merely on her own behalf and lacked authority to bind Standard.

for its spoliation. *See* Defendants' S/J Motion at 7–9. However, Pearl did not ask or authorize On–Site to overwrite Chunn's HDD, nor is Pearl responsible for Chunn's alleged failure to make a backup copy of its contents. Nor, even assuming *arguendo* that Daudelin wrongfully seized and retained the HDD, does Chunn have any evidence that its contents were destroyed, tampered with or in any other way further spoiled as a result. Thus, Chunn fails to demonstrate loss of evidence attributable to negligent or worse conduct on the part of Daudelin or Pearl. *Compare, e.g., Silvestri v. General Motors Corp.*, 271 F.3d 583, 593 (4th Cir.2001) ("[S]ometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness: The expansion of sanctions for the inadvertent loss of evidence recognizes … the resulting unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission.") (citation and internal quotation marks omitted).

 Nonetheless, the HDD theory falters for a different reason—that Pearl fails to adduce sufficient cognizable evidence to raise a genuine issue regarding it. Assuming *arguendo* that one resolves any chain-of-custody doubts in Pearl's favor, one could reasonably infer that Chunn (or someone acting at Chunn's direction) copied some of Pearl's files in building Chunn's ATS. However, Chunn adduces evidence (which Pearl tries, but fails, effectively to controvert) that for the only trades he carried out, he did not need, and went out of his way not to use, the specific software components that Pearl ultimately identified as trade secrets: [**REDACT-**

ED], the execution system, the broker system, the feed parser system and the control panel and node manager.

Moreover, although Pearl attempted to adduce its own evidence concerning the nature of the copying that the GUIDs revealed (*i.e.*, that components of Pearl's ATS were copied and that these particular components were protected by copyright registration), that evidence was not supported by the citations given. In the absence of any cognizable evidence that the GUIDs trace back to trade-secret data, there is no triable issue whether Chunn misappropriated trade secrets based on the presence on the HDD of the GUIDs.

I accordingly recommend that Standard be granted and Pearl be denied summary judgment as to Count I and that Chunn be granted partial summary judgment with respect only to any theory of violation of the UTSA premised on the presence of GUIDs on the HDD.

### B. Count II of Complaint: Computer Fraud and Abuse Act

 In Count II of its complaint, Pearl alleges that the Defendants violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by virtue of their alleged unauthorized accessing of "Pearl's Network" to obtain valuable ATS information. Complaint ¶¶ 102–14. The Defendants' bid for summary judgment as to this count, predicated in part on an assertion that Pearl has not demonstrated that it suffered the requisite damages, *see* Defendants' S/J Motion at 11, should be granted.[51]

The CFAA provides in relevant part:

---

**51.** Technically, the Defendants press their damages-based argument on behalf of Chunn only. *See* Defendants' S/J Motion at 9–11. Inasmuch as the point has the same force with respect to Standard as to Chunn, and the issue is joined, *see* Plaintiff's S/J Opposition at 10, I recommend that the court grant summary judgment *sua sponte* to Standard on the damages basis. *See Rogan v. Menino*, 175 F.3d 75, 79 (1st Cir.1999) ("It is apodictic that trial courts have the power to grant summary judgment sua sponte" provided matter

Any person who suffers damage or loss by reason of a violation of this section [18 U.S.C. § 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)....

18 U.S.C. § 1030(g). The five clauses of subsection (a)(5)(B) are as follows:

(i) loss to 1 or more persons during any 1–year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security[.]

*Id.* § 1030(a)(5)(B). Pearl's allegations implicate only the first of these clauses: "loss to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value[.]" *Id.* § (a)(5)(B)(i). In its papers opposing summary judgment, Pearl argues that the Defendants' alleged wrongful connection to its system adversely affected the system's speed and operation, thereby causing damages. *See* Plaintiff's S/J Op-

position at 10. However, while Pearl adduces evidence that speed was important to the operation of its ATS, it sets forth no cognizable evidence that the Defendants' alleged conduct damaged its system in any quantifiable amount, let alone in an amount approximating more than $5,000 in one year. This is fatal to its CFAA cause of action. *Compare, e.g., America Online, Inc. v. National Health Care Discount, Inc.,* 174 F.Supp.2d 890, 899–901 (N.D.Iowa 2001) (detailing evidence demonstrating damage incurred by plaintiff in amounts exceeding $5,000 in each of three years as result of defendant's transmission of unsolicited e-mail in violation of CFAA).

The Defendants therefore are entitled to summary judgment as to Count II.

## C. Count III of Complaint: Digital Millenium Copyright Act

■ In Count III of its complaint, Pearl alleges that the Defendants violated the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1201(a)(1)(A), by circumventing the protections of Pearl's encrypted, password-protected virtual private network ("VPN") to gain unauthorized access to data that included Pearl's copyrighted software. Complaint ¶¶ 32–33, 115–20. Both Defendants seek summary judgment as to this count, *see* Defendants' S/J Motion at 12–13; however, only Standard is entitled to prevail.

Pearl predicates its DMCA claim on the alleged creation of a "tunnel" from the Chunn server at On–Site to Pearl's On–Site network. *See* Plaintiff's S/J Opposition at 12. The Defendants repeat their argument (made in the context of Count I) that the conduct in issue is that of Chunn, *qua* individual, and that Pearl's evidence and arguments fall short of creating a triable issue as to Standard's liability. *See* Defendants' S/J Motion at 12. For rea-

sufficiently developed, appropriate notice given).

350

sons discussed above in connection with Count I, the Defendants are correct. Standard is entitled to summary judgment as to Count III.

The Defendants' arguments with respect to Chunn are less persuasive. They first suggest that because no court has extended the protections of the DMCA to VPNs (an assertion that my research corroborates), this court should refrain from doing so. *See* Defendants' S/J Motion at 12. Although this appears to be an issue of first impression, it is not a difficult one.

The relevant portion of the DMCA bars any person from "circumvent[ing] a technological measure that effectively controls access to a work protected under this title [Title 17, Copyrights]." 17 U.S.C. § 1201(a)(1)(A). To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). A technological measure "effectively controls access to a work" if "the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). As the District Court for the Southern District of New York has observed:

> The DMCA contains two principal anticircumvention provisions. The first, Section 1201(a)(1), governs the act of circumventing a technological protection measure put in place by a copyright owner to control access to a copyrighted work, an act described by Congress as the electronic equivalent of breaking into a locked room in order to obtain a copy of a book.

*Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294, 316 (S.D.N.Y. 2000), *aff'd,* 273 F.3d 429 (2d Cir.2001) (citations and internal quotation marks omitted). The VPN, as described by Pearl, squarely fits the definition of "a technological protection measure put in place by a copyright owner to control access to a copyrighted work." Pearl's VPN is the "electronic equivalent" of a locked door.

The Defendants next posit that, in any event, the VPN in issue here should not be considered a "technological measure" inasmuch as it did not effectively control Chunn's access in view of the fact that he had written the software in question himself and maintained a backup file of it for Pearl. *See* Defendants' S/J Motion at 12. This contention plainly is without merit. The question of whether a technological measure "effectively controls access" is analyzed solely with reference to how that measure works "in the ordinary course of its operation." 17 U.S.C. § 1201(a)(3)(B). The fact that Chunn had alternative means of access to the works is irrelevant to whether the VPN effectively controlled access to them.

The Defendants finally argue that the evidence is undisputed that employees of On–Site, rather than Chunn, configured his server and router and therefore he could not have been responsible for the alleged "tunnel" from his server to the Pearl VPN. *See* Defendants' S/J Motion at 13. However, the parties dispute whether On–Site employees alone configured users' servers and routers. If a fact-finder were to credit Pearl's version of these facts, it reasonably could infer that Chunn configured his server and router to tunnel into Pearl's network.

For these reasons, Standard alone is entitled to summary judgment as to Count III.

### D. Count IV of Complaint: Copyright Infringement

■ In Count IV of its complaint, Pearl alleges that the Defendants infringed its copyrights in the following software components registered with the U.S. Copyright Office: (i) Pearl Engine 1 Control Panel & Node Managers, (ii) Pearl Engine 1 Execution & Broker System, (iii) Pearl Engine 1 Feed Parsers System and (iv) Pearl Engine 1 IMDB System. Complaint ¶¶ 121–27. The Defendants' bid for summary judgment as to this count, *see* Defendants' S/J Motion at 13–14, should be granted.

Pearl's copyright-infringement claim rests on its evidence that GUIDs traceable to its files were found on Chunn's HDD. *See* Plaintiff's S/J Opposition at 14–15. As the Defendants argue, the claim implodes for lack of evidence. *See* Defendants' S/J Motion at 13–14; Defendants' S/J Reply at 5–6. First, as discussed above in the context of Count I, there is insufficient evidence to hold Standard liable for the conduct in question, which implicates Chunn's attempts to create his own ATS. Second, Pearl fails to generate cognizable evidence that the GUIDs found on Chunn's HDD were traceable to the above-cited copyright-registered software components.

Third and finally, even assuming *arguendo* that those GUIDs could be linked to one or more of those components, in the absence of a copy of the Chunn ATS a fact-finder could not make the type of comparison between the original work and the allegedly infringing work necessary to analysis of whether a copyright has been infringed. *See, e.g., Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 33 (1st Cir.2001) ("This Court conducts a two-part test to determine if illicit copying has occurred. First, a plaintiff must prove that the defendant copied the plaintiff's copyrighted work, either directly or through indirect evidence. Second, the plaintiff must prove that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works substantially similar.") (citations and internal quotation marks omitted).

Both Standard and Chunn accordingly are entitled to summary judgment as to Count IV.

### E. Count V of Complaint: Breach of Contract

In Count V of its complaint, Pearl asserts that the Defendants breached (i) an agreement between Standard and Pearl requiring that programming work be performed in a professional and workmanlike manner and (ii) agreements between Pearl and the Defendants prohibiting disclosure or use of information other than as needed to serve Pearl's needs. Complaint ¶¶ 128–34. The parties cross-move for summary judgment as to this count. *See* Defendants' S/J Motion at 1; Plaintiff's S/J Motion at 1.[52]

■ In its summary-judgment papers, Pearl narrows the scope of what is in issue, clarifying that it presses a claim that Standard and Chunn breached the NDA, not the programming-work contract, and that the NDA was breached by virtue of the Scalper to create Chunn's ATS. *See, e.g.,* Plaintiff's S/J Opposition at 6–7; Plaintiff's S/J Motion at 9–12.

As noted above in the context of Count I, there are triable issues whether (i) Pearl owned the Scalper concept by operation of NDAs signed by Chunn and purportedly

---

**52.** Technically, Pearl moves for summary judgment only against Chunn as to this count. *See* Plaintiff's S/J Motion at 1. However, in opposing the Defendants' cross-motion for summary judgment, it suggests that entry of summary judgment in its favor as against Standard would be appropriate. *See* Plaintiff's S/J Opposition at 5.

by Standard (via Janet Chunn) and (ii) the Scalper program and the Chunn ATS are similar enough to permit an inference that Chunn based his ATS on the Scalper.

Accordingly, neither side demonstrates its entitlement to summary judgment as to Count V.

### F. Counts VI–VII of Complaint: Breach of Warranty

The Defendants next move for summary judgment as to Pearl's breach-of-warranty claims: Count VI (breach of warranty/services), alleging that the Defendants breached express and implied warranties that their work would be sufficient to meet Pearl's needs and would be performed in a professional and workmanlike manner, and Count VII (breach of warranty/goods), alleging that the software and upgrade sold to Pearl breached warranties of merchantability and fitness for a particular purposes implied by operation of two sections of the Maine Uniform Commercial Code ("UCC"), 11 M.R.S.A. §§ 2–314 and 2–315. See Complaint ¶¶ 135–43; Defendants' S/J Motion at 17.

■■■ Although the Defendants purport to seek summary judgment as to the entirety of Count VI, they confine their argument to that portion asserting breach of an implied services warranty. See Defendants' S/J Motion at 17; Defendants' S/J Reply at 6–7. They contend, in essence, that no such implied warranty exists. See id. I agree. I find no Maine case addressing whether a warranty should be implied in the context of the provision of services. Pearl cites Libby v. Woodman Potato Co., 135 Me. 305, 195 A. 569 (1937), for the proposition that such a warranty is implied in Maine law, see Plaintiff's S/J Opposition at 14, but Libby concerned (and addressed) only goods.

Inasmuch as appears from my research, courts in other jurisdiction have been wary of recognizing implied warranties in the context of performance of services, doing so only for compelling public-policy reasons. See, e.g., Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d 50, 53 (Tex.1998) ("An implied warranty that services will be performed in a good and workmanlike manner may arise under the common law when public policy mandates. Public policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need.") (citations omitted); Held v. 7–Eleven Food Store, 108 Misc.2d 754, 438 N.Y.S.2d 976, 979 (N.Y.Sup.Ct.1981) ("The Courts of our state do not recognize a cause of action based upon breach of warranty arising out of the performance of services. If a service is performed negligently the cause of action accruing is for that negligence. Likewise, if it constitutes a breach of contract, the action is for that breach. The distinction in the case of a sale of goods is that a warranty gives rise to a cause of action without fault.") (citations omitted).

There is no reason to believe the Law Court would recognize an implied services warranty in the circumstances of this case. The Defendants thus demonstrate entitlement to summary judgment as to that portion of Count VI alleging breach of an implied warranty (services), but not that portion alleging breach of an express warranty (services), as to which no argument is made.

■■■ The Defendants seek summary judgment as to Count VII (breach of warranty/goods) on the basis that the UCC is inapplicable to the contract in issue. See Defendants' S/J Motion at 17; Defendants' S/J Reply at 6. As the First Circuit has noted, under Maine law "the test for inclusion or exclusion from Article 2 [of the UCC] is not whether the goods and non-goods parts of the contract are mixed, but

rather, whether their predominant factor, their thrust, their purpose, reasonably stated ... is a transaction of sale." *Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 14 (1st Cir.1987) (citation and internal quotation marks omitted).

Inasmuch as appears, the Law Court has not had occasion to consider whether a contract for the provision of software primarily constitutes a good or a service. Pearl asserts that the weight of authority favors treatment of software programs as goods for purposes of the UCC. *See* Plaintiff's S/J Opposition at 13 (citing *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654–55 (7th Cir.1998); *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3rd Cir.1991); *RRX Indus., Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546–47 (9th Cir.1985)). However, I agree with the Defendants, *see* Defendants' S/J Reply at 6 & n. 6, that the cases on which Pearl relies are distinguishable. The programmers in *Dharma, Unisys* and *RRX* sold preexisting software (albeit with custom modifications or upgrades to adapt it to the user's needs or equipment) and were paid in a manner primarily reflecting sale of goods, *e.g.,* in *Dharma,* an upfront software licensing fee coupled with fees for modifications. *See Dharma,* 148 F.3d at 651, 654–55; *Unisys,* 925 F.2d at 674, 676; *RRX,* 772 F.2d at 545–46. By contrast, in the instant case, Standard and Pearl agreed that Standard would create ATS software from scratch (concept to realization) for which it would be paid on a time and materials basis.

I find cases more closely on point than *Dharma, Unisys* and *RRX* holding that, for purposes of applicability of the UCC, development of a software system from scratch primarily constitutes a service. *See Multi–Tech Sys., Inc. v. Floreat, Inc.*, No. CIV. 01–1320 DDA/FLN, 2002 WL 432016, at *3–*4 (D.Minn. Mar. 18, 2002)

("The few cases considering the question indicate that the UCC does not apply to an agreement to design and develop a product, even if compensation under that agreement is based in part on later sales of that product.... Any software in a tangible medium that Floreat provided to Multi–Tech pursuant to the 1992 and 1995 Contracts at best was incidental to the predominant purpose of those agreements, which was to develop and improve the MultiExpress PCS and MultiModem PCS product."); *Wharton Mg't Group v. Sigma Consultants, Inc.*, 1990 WL 18360, at *3 (Del.Super.Ct. Jan. 29, 1990), *aff'd,* No. 69, 1990, 1990 WL 168240 (Del. Sept. 19, 1990) ("Wharton bargained for Sigma's skill in developing a system to meet its specific needs.... The service element of the transaction so dominates the subject matter of the contract that, even though a tangible end product seemingly within the definition of 'goods' was produced, the contract is more readily characterized as one for services. Where, as here, the contract is exclusively or primarily for services, it is outside the scope of Article 2 of the U.C.C.").

I am satisfied that on these facts the Law Court likewise would hold the UCC inapplicable. The Defendants accordingly are entitled to summary judgment as to Count VII.

### G. Count VIII of Complaint: Trespass to Chattels

The Defendants next move for summary judgment as to Count VIII of the Complaint, in which Pearl alleges that they committed trespass to chattels in accessing and using Pearl's network without authorization. Complaint ¶¶ 144–48; Defendants' S/J Motion at 17–18.

The Defendants repeat their argument that this claim does not sufficiently implicate Standard to hold it liable for the tortious acts alleged. *See* Defendants' S/J

Motion at 17. I agree. The conduct in issue is the plug-in of Chunn's server to Pearl's router and KVM switch. *See* Plaintiff's S/J Opposition at 11. Standard is entitled to summary judgment as to Count VIII for the same reasons that it is entitled to summary judgment as to Count I.

 In any event, both Defendants are entitled to summary judgment as to this count for a different reason. "A trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *America Online, Inc. v. IMS,* 24 F.Supp.2d 548, 550 (E.D.Va.1998) (citing Restatement (Second) of Torts § 217(b)). "One who commits a trespass to a chattel is liable to the possessor of the chattel if the chattel is impaired as to its condition, quality, or value." *Id.* (quoting Restatement (Second) of Torts § 218(b)).

As the Defendants point out, *see* Defendants' S/J Reply at 7, even assuming *arguendo* that Chunn did access Pearl's network without authorization, there is no evidence that in so doing he impaired its condition, quality or value. On this basis both Defendants accordingly are entitled to summary judgment as to Count VIII.

### H. Counterclaim Count I: Tortious Interference

 In Count I of his counterclaim, Chunn alleges that Pearl and Daudelin tortiously interfered with a contract or prospective business advantage by intimidating ABW into canceling its contract with him. Counterclaim ¶¶ 24–27. Pearl and Daudelin seek summary judgment as to this count on grounds that Chunn cannot demonstrate that either engaged in fraud or intimidation causing ABW to cancel the contract in issue. *See* Plaintiff's S/J Motion at 16. I agree.

The Law Court has "long recognized that if a person by fraud or intimidation procures the breach of a contract that would have continued but for such wrongful interference, that person can be liable in damages for such tortious interference." *Pombriant v. Blue Cross/Blue Shield of Me.,* 562 A.2d 656, 659 (Me.1989).

The relevant cognizable evidence, viewed in the light most favorable to Chunn, amounts to the following: that (i) Chunn himself did nothing to trigger cancellation of his ABW contract, (ii) the contract was canceled shortly after Daudelin drove to ABW's facilities and seized Chunn's server, (iii) the Pearl account generated a significant amount of revenue for ABW and (iv) Daudelin was known in other contexts to have bullied people. While this is enough for a trier of fact to infer that ABW canceled the contract because of Daudelin and Pearl, it is not enough to support a reasonable inference that Daudelin or Pearl procured its cancellation by means of fraud or intimidation. Such an inference would cross the line from the reasonable to the speculative. "[I]mprobable inferences and unsupported speculation are insufficient to establish a genuine dispute of fact." *Robroy,* 200 F.3d at 2 (citations and internal punctuation omitted).

Daudelin and Pearl accordingly are entitled to summary judgment as to Count I of Chunn's counterclaim.

### I. Counterclaim Count II: Conversion

 In Count II of his counterclaim, Chunn asserts that Daudelin, acting on behalf of and in concert with Pearl, wrongfully converted to his own use property owned by Chunn without Chunn's knowledge or consent. Counterclaim ¶¶ 28–30. Chunn, Daudelin and Pearl cross-move for summary judgment as to this count. *See* Plaintiff's S/J Motion at 17–19; Defendants' S/J Opposition at 14–15.

 Pearl and Daudelin suggest that the outcome is the same with respect to this claim regardless of whether the law of Maine or New York applies, *see* Plaintiff's S/J Motion at 17, and I agree. Under Maine law, "[t]he necessary elements to make out a claim for conversion are: (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder." *Withers v. Hackett,* 714 A.2d 798, 800 (Me.1998). In New York, conversion is defined as the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, Tex.,* 87 N.Y.2d 36, 637 N.Y.S.2d 342, 660 N.E.2d 1121, 1126 (1995) (citations and internal quotation marks omitted).

It is undisputed that Daudelin seized Chunn's server from ABW without Chunn's knowledge or permission and that Daudelin and Pearl were unwilling to return the server, despite demand, without certain conditions that evidently were unacceptable to Chunn. Daudelin and Pearl emphasize that the server was discovered to have been connected to Pearl's KVM and router without its authorization and that Daudelin's intent was solely to preserve evidence for any later claim against whomever owned the server. *See* Plaintiff's S/J Motion at 17.

 As Chunn observes, *see* Defendants' S/J Opposition at 14–15, wrongful intent is not a necessary element of a claim of conversion (and, conversely, good faith is not a defense), *see, e.g., Schwartz v. Schwartz,* 81 Misc.2d 177, 365 N.Y.S.2d 584, 588 (N.Y.City Civ.Ct.1974), *aff'd as modified on other grounds,* 82 Misc.2d 51, 365 N.Y.S.2d 589 (N.Y.Sup.App.Term 1975) ("Suffice it to say, in answer to the good faith argument, that wrongful intent is not an essential element of a conversion. It is entirely immaterial to the issue here under consideration even if that were the fact, that these defendants acted in good faith under the direction of Bertha Schwartz or that they derived no beneficial use of the money in the ordinary sense, for the essence of the wrong (the conversion) is that the use and possession were dealt with in a manner adverse to the plaintiff and inconsistent with his right of dominion.") (citations and internal quotation marks omitted); *Laverrierre v. Casco Bank & Trust Co.,* 155 Me. 97, 100, 151 A.2d 276 (Me.1959) ("Ordinarily, a wrongful sale of another's personal property, because it is an assertion of dominion over the property in defiance of, or inconsistent with, the owner's rights is a tortious conversion. This is true even though the wrongful sale is made in good faith or because of honest mistake.").

 To the extent that Pearl and Daudelin suggest that, rather than having been "mistaken," they were privileged to act as they did (for example, to prevent spoliation of evidence), they fail to develop the argument, citing no authority for any claimed privilege. *See* Plaintiff's S/J Reply at 7–8. They thereby effectively waive the point. *See, e.g., Graham v. United States,* 753 F.Supp. 994, 1000 (D.Me.1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.") (citation and internal quotation marks omitted).[53]

---

**53.** My own research reveals a basis on which Pearl's and Daudelin's actions arguably were privileged (at least initially): defense of chattels. *See* Restatement (Second) of Torts

**356**

Nor is summary judgment staved off by Pearl's and Daudelin's contention that Chunn fails to show damages, *see* Plaintiff's S/J Motion at 19—an assertion that Chunn disputes.

Chunn accordingly is entitled to summary judgment as to liability with respect to Count II of his counterclaim, with damages to be determined by a trier of fact.

### IV. Conclusion

For the foregoing reasons, I recommend that the Plaintiff's S/J Motion be **GRANTED** as to Counts I and IV of the Counterclaim and otherwise **DENIED**, and that the Defendants' S/J Motion be **GRANTED** with respect to (i) Standard, as to Counts I and III of the Complaint; (ii) Chunn, as to Count I of the Complaint to the extent the claimed violation of the UTSA is predicated on the existence of GUIDs on the Chunn HDD; (iii) both Standard and Chunn, as to Counts II, IV, VII and VIII of the Complaint and that portion of Count VI of the Complaint asserting violation of an implied warranty/services; and (iv) Count II of the Counterclaim; and otherwise DENIED.

Should this recommended decision be adopted, remaining for trial will be the following: Count I of the Complaint (misappropriation of trade secrets) against Chunn only, with the caveat that Pearl be precluded from premising any such claim on contents found on the HDD; Count III of the Complaint (violation of the DMCA) against Chunn only; Count V of the Complaint (breach of contract) against both Standard and Chunn; Count VI of the Complaint (breach of warranty/services) against both Standard and Chunn, to the extent asserting breach of express warranty only; and Count II of the Counterclaim, with respect only to the amount of damages to be awarded Chunn.

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

April 2, 2003.

---

§ 260(1) ("[O]ne is privileged to commit an act which would otherwise be a . . . conversion if the act is, or is reasonably believed to be, necessary to protect the actor's land or chattels or his possession of them, and the harm inflicted is not unreasonable as compared with the harm threatened."). However, the scope of such privileges is limited. *See, e.g., id.* § 278(1) ("One who exercises any privilege to commit an act which would otherwise be . . . a conversion is subject to liability for any harm to the interest of another in the chattel caused by any dealing with it in a manner which is in excess of the privilege or not reasonably necessary to accomplish the purpose for which it is given."). On this record, and in the absence of further developed argumentation, it is far from clear that even had Pearl and Daudelin relied on this privilege, the entire periods of time during which the server and the HDD, respectively, were withheld from Chunn would be covered.